IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

WALTER RYAN SALLEE,

      Plaintiff,

v.                                                                 Civ. No. 22-532 KK

MARTIN O'MALLEY, Commissioner
of Social Security,[1]

      Defendant.

**MEMORANDUM OPINION AND ORDER**[2]

Before the Court is Plaintiff Walter Ryan Sallee's Opposed Motion to Reverse or Remand (Doc. 26), filed May 1, 2023. In his motion, Mr. Sallee seeks reversal and/or remand of the Commissioner of the Social Security Administration's ("Commissioner's") final decision discontinuing Mr. Sallee's disability insurance benefits. (*Id.*) In support, Mr. Sallee argues that: (1) in assessing Mr. Sallee's residual functional capacity, the administrative law judge ("ALJ") who rendered the Commissioner's final decision failed to state or make discernible the weight she afforded the opinions of a medical source; and, (2) the ALJ failed to adequately explain the medical basis for her finding that Mr. Sallee had medically improved. (*Id.*)

On July 31, 2023, the Commissioner filed a response to Mr. Sallee's motion, and on September 12, 2023, Mr. Sallee filed a reply. (Docs. 32, 35.) Having meticulously reviewed the entire record and the relevant law, being otherwise sufficiently advised, and for the reasons set forth below, the Court finds that Mr. Sallee's motion is well-taken and should be GRANTED.

---

[1] Martin O'Malley was sworn in as the Commissioner of Social Security on December 20, 2023, and is automatically substituted as a party under 42 U.S.C. § 405(g) and Federal Rule of Civil Procedure 25(d).

[2] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 13.)

## I. BACKGROUND AND PROCEDURAL HISTORY

Mr. Sallee filed his claim for disability insurance benefits ("DIB") with the Social Security Administration ("SSA") in May 2012 following a March 2011 fall from a roof. (AR 109-10, 1908.[3]) Mr. Sallee alleged disability due to back injury, ankle injury, chronic pain, depression, anxiety, insomnia, and chronic fatigue. (AR 110-11, 114.) The claim was denied initially and upon reconsideration. (*See* AR 120, 137.) In July 2013, Mr. Sallee requested a hearing before an ALJ, which ALJ John Morris held on October 8, 2014. (AR 143.)

On December 18, 2014, ALJ Morris issued a fully favorable decision, finding that Mr. Sallee had been disabled since April 13, 2011, due to his "right shoulder impairment, right ankle injury, and degenerative disc disease and impairment of the thoracic spine." (AR 143-49.) However, ALJ Morris found Mr. Sallee's depression to be non-severe. (AR 145.)

On June 18, 2018, in a continuing disability review ("CDR") at the initial level, the SSA determined that Mr. Sallee is no longer disabled and that his DIB should cease.[4] (AR 152-168, 247-253.) The SSA made the same determination upon reconsideration after a hearing before a disability hearing officer. (AR 256, 264-80.) On May 28, 2019, Mr. Sallee requested a hearing before an ALJ, which ALJ Jennifer Fellabaum held on September 9, 2021. (AR 16, 66-108, 283.)

On October 27, 2021, ALJ Fellabaum issued an unfavorable decision finding that Mr. Sallee's disability ended on June 20, 2018, and he has not become disabled again since that date.

---

[3] Citations to "AR" refer to the certified Transcript of the Administrative Record filed on December 30, 2022. (Doc. 17.)

[4] "There is a statutory requirement that, if you are entitled to disability benefits, your continued entitlement to such benefits must be reviewed periodically." 20 C.F.R. § 404.1594(a). The Commissioner refers to this process as a "continuing disability review." (Doc. 32 at 2.)

(AR 16-34.) On June 16, 2022, the Appeals Council denied Mr. Sallee's request for review, and ALJ Fellabaum's decision became administratively final. (AR 1-4.) On July 19, 2022, Mr. Sallee filed this action under 42 U.S.C. § 405(g) seeking reversal and/or remand of ALJ Fellabaum's decision. (Docs. 1, 26.)

## II. LEGAL STANDARDS

### A. Standard of Review

Courts apply the same standard in reviewing the Commissioner's decisions whether the decision initially denies benefits or subsequently terminates them. *Hayden v. Barnhart*, 374 F.3d 986, 988 (10th Cir. 2004); *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994); *see Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). Specifically, this Court must affirm the Commissioner's final decision unless: (1) "substantial evidence" does not support the decision; or, (2) the ALJ failed to apply correct legal standards to reach the decision. *Maes*, 522 F.3d at 1096; *Hayden*, 374 F.3d at 988. The Court must meticulously review the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008); *Flaherty v. Astrue*, 515 F.3d 1067, 1070-71 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. It is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992).

3

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation marks and brackets omitted). Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "in addition to discussing the evidence supporting [her] decision, the ALJ also must discuss the uncontroverted evidence [she] chooses not to rely upon, as well as significantly probative evidence [she] rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). If the ALJ fails to do so, "the case must be remanded for the ALJ to set out [her] specific findings and [her] reasons for accepting or rejecting evidence[.]" *Id.* at 1010.

In reviewing an ALJ's decision, courts only consider arguments "adequately briefed for … review." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012). In addition, where a court "can follow the adjudicator's reasoning" and "determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal." *Id.* at 1166.

### B. Sequential Evaluation Process for CDR

The Commissioner will terminate an individual's benefits on CDR if the physical or mental impairments that formed the basis of the award of benefits have ceased, do not exist, or are no longer disabling. 42 U.S.C. § 423(f); 20 C.F.R. § 404.1594. To determine whether disability continues or has ended, the Commissioner applies an eight-step sequential evaluation process. *See* 20 C.F.R. § 404.1594(f)(1)-(8). If a finding of disability or non-disability is directed at any point, the SSA will not proceed through the remaining steps. *Id.*

At step one, the Commissioner determines whether the disability beneficiary is engaging in substantial gainful activity. 20 C.F.R. § 404.1594(f)(1). At step two, he determines whether the beneficiary has an impairment or combination of impairments that meets or equals a Listing under 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 404.1594(f)(2). At step three, the Commissioner assesses whether there has been medical improvement as shown by a decrease in the medical severity of the impairments present at the time of the most recent medical decision demonstrating that the beneficiary was or continued to be disabled. 20 C.F.R. § 404.1594(b)(1), (f)(3). "A determination that there has been a decrease in medical severity must be based on improvement in the symptoms, signs, and/or laboratory findings associated with" the beneficiary's impairments. 20 C.F.R. § 404.1594(b)(1).

If there has been medical improvement, the Commissioner proceeds to step four, at which he determines whether the medical improvement is related to the ability to do work – "i.e., whether or not there has been an increase in the residual functional capacity [("RFC")][5] based on the impairment(s) … present at the time of the most recent favorable medical determination." 20 C.F.R. § 404.1594(f)(4). If there has been no medical improvement, or if the improvement is not related to the ability to work, the Commissioner moves on to step five to determine if any exception applies. 20 C.F.R. § 404.1594(f)(5). If medical improvement is related to the ability to do work or if one of the first of two groups of exceptions applies,[6] the Commissioner must

---

[5] 20 C.F.R. § 404.1545(a)(1) gives the following explanation of a claimant's RFC: "Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your [RFC] is the most you can still do despite your limitations."

[6] There are two groups of exceptions to be considered at step five of the CDR sequential evaluation process. The first group of exceptions covers limited situations when disability can be found to have ended even though medical improvement has not occurred if the disability beneficiary engages in substantial gainful activity, or evidence shows that the person should no longer be considered disabled or that the person never should have been considered disabled.

proceed to step six to determine all current impairments in combination are severe. 20 C.F.R. § 404.1594(f)(5), (f)(6). At step seven, the Commissioner is required to assess the beneficiary's RFC based on all current impairments and consider whether the person can perform past relevant work. 20 C.F.R. § 404.1594(f)(7). Finally, if the beneficiary cannot perform past relevant work, the ALJ must determine at step eight whether there is other work the beneficiary could perform. 20 C.F.R. § 404.1594(f)(8).

The Commissioner bears the burden of proof in a termination-of-benefits review. *Hayden*, 374 F.3d at 991; *Glenn*, 21 F.3d at 987.

### III. ALJ FELLABAUM'S DECISION

In the decision under review, ALJ Fellabaum applied the eight-step evaluation process prescribed by 20 C.F.R. § 404.1594(f) to evaluate whether Mr. Sallee is entitled to continued benefits. (*See* AR 16-34.) The ALJ determined that the most recent favorable medical decision finding Mr. Sallee disabled was ALJ Morris' December 18, 2014 decision. (AR 18; *see* AR 143-49.) As such, ALJ Morris' decision served as the "comparison point decision" for purposes of ALJ Fellabaum's disability review analysis. (AR 18.)

---

*See* 20 C.F.R. § 404.1594(d). This first group of exceptions includes without limitation circumstances where substantial evidence demonstrates that: (1) advances in medical or vocational therapy or technology have increased the person's ability to do basic work; (2) the person has undergone vocational therapy (related to ability to work); (3) based on new or improved diagnostic or evaluative techniques the person's impairments are not as disabling as they were considered to be at the time of the most recent favorable decision; and/or (4) any prior disability decision was in error. *Id.* Unlike the first group of exceptions, if an ALJ finds that one of the second group of exceptions applies, the beneficiary's "disability will be found to have ended" without further analysis of whether the beneficiary is currently able to engage in substantial gainful activity. 20 C.F.R. § 404.1594(d), (e), (f)(5). The second group of exceptions includes circumstances where: (1) the prior determination or decision was fraudulently obtained; (2) the disability beneficiary does not cooperate with the SSA; (3) the SSA is unable to find the person; and/or (4) the person fails to follow prescribed treatment which would be expected to restore the ability to engage in substantial gainful activity. 20 C.F.R. § 404.1594(e).

At step one, ALJ Fellabaum found that Mr. Sallee had not engaged in substantial gainful activity through the date of her decision. (AR 18.) At step two, the ALJ found that Mr. Sallee's current impairments of degenerative disc disease, residual effects of right ankle fracture, chronic pain syndrome, obesity, hypertension, obstructive sleep apnea, depression, anxiety, bipolar type schizoaffective disorder, and post-traumatic stress disorder do not, alone or in combination, meet or medically equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 18-20.) At step three, the ALJ found that Mr. Sallee has medically improved, and at step four she found that this improvement is related to his ability to work because it results in an increase in his RFC. (AR 20.)

At step six,[7] the ALJ found that Mr. Sallee has "continued to have a severe impairment or combination of impairments." (AR 20-21.) At step seven, the ALJ found that, based on his impairments present since the date of medical improvement, Mr. Sallee has had the RFC to perform light work, except that

> he can occasionally climb ramps and stairs, stoop, crouch, kneel, and crawl; can never climb ladders, ropes or scaffolds, or be exposed to unprotected heights or hazardous machinery; can frequently use right foot controls; can frequently reach in all directions bilaterally; can perform simple, routine tasks, with no fast paced production work; can make simple work decisions; work should be performed in the same location every day; and can occasionally interact with co-workers, supervisors, and the general public.

(AR 21-32.)[8] Further, the ALJ found that Mr. Sallee is unable to perform his past relevant work. (AR 32.) However, at step eight, the ALJ found that Mr. Sallee is "able to perform a significant

---

[7] ALJ Fellabaum did not consider step five because an ALJ need only consider this step if she determines either that a beneficiary has not medically improved or that the beneficiary's medical improvement is unrelated to his ability to work. *See* 20 C.F.R. § 404.1594(f).

[8] In contrast, ALJ Morris found Mr. Sallee had the RFC to perform sedentary work "except that he can occasionally climb ramps and stairs[,] … can never climb ladders, ropes, or scaffolds[,] … can only occasionally stoop, kneel,

7

number of [other] jobs in the national economy," such as garment sorter, marker, linen grader, circuit board inspector, addresser, and table sorter. (AR 32-33.)

## IV. DISCUSSION

In his Motion, Mr. Sallee argues that ALJ Fellabaum inadequately explained her step-seven finding of a less restrictive RFC because she failed to state or make discernible the weight she afforded Certified Nurse Practitioner Pamela Garfield's opinions. (Doc. 26 at 23; *see also* Doc. 35 at 1-4.) As explained below, the Court agrees.[9]

### A. Record Evidence Regarding CNP Garfield's Opinions

CNP Garfield is a psychiatric nurse practitioner who assessed Mr. Sallee's mental functioning and prescribed and managed Mr. Sallee's psychiatric medications. (AR 26, 29-30, 1522-32, 1544-48, 1607-32.) Mr. Sallee saw CNP Garfield for these purposes "every one to three months" between July 2019 and September 2020. (AR 26, 29-30, 1522-32, 1544-48, 1607-32.)

In January 2020, CNP Garfield completed a medical source statement indicating that Mr. Sallee has multiple serious work-related mental limitations. (AR 1571-75.) Among other things, CNP Garfield opined that Mr. Sallee was "[s]eriously limited" in the abilities to: (1) maintain attention for two-hour segments; (2) maintain regular attendance and be punctual within customary tolerances; (3) set realistic goals or make plans independently; (4) interact appropriately with the public; and, (5) maintain socially appropriate behavior. (AR 1573-74.) She further opined that he

---

crouch, and crawl[, and] … only occasionally lift[] overhead bilaterally." (AR 146.) ALJ Morris did not include any mental limitations in Mr. Sallee's RFC. (AR 146.)

[9] Because the Court finds that this claim of error warrants remand, it will not address Mr. Sallee's other claim of error, which may be affected by the ALJ's treatment of the case on remand. *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

8

was "[u]nable to meet competitive standards" with respect to the abilities to: (1) sustain an ordinary routine without special supervision; (2) make simple work-related decisions; (3) complete a normal workday and workweek without interruption from psychologically based symptoms; (4) ask simple questions or request assistance; and, (5) get along with coworkers without unduly distracting them or exhibiting behavioral extremes. (AR 1573-74.) Finally, she opined that he has "[n]o useful ability" to: (1) perform at a consistent pace without an unreasonable number and length of rest periods; (2) respond appropriately to changes in a routine work setting; (3) deal with normal work stress, as to unskilled work; and, (4) deal with the stress of semiskilled and skilled work. (AR 1573-74.)

In support of these limitations, CNP Garfield explained that Mr. Sallee has "suffered from depression and related mood disorder due to" the "chronic back injury" he suffered in 2011 from falling off of a roof. (AR 1573.) She added that he "has difficulty concentrating, has mood swings, depression, impaired judgment, developmental arrest, … anger issues, [and] irritability," as well as "paranoia." (AR 1574-75.) She also opined that Mr. Sallee cannot manage benefits in his own best interest. (AR 1575.)

In March 2020, CNP Garfield completed a Mental Disorders Disability Benefits Questionnaire for the United States Department of Veterans Affairs ("VA"), in which she indicated that Mr. Sallee has "[o]ccupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking and/or mood." (AR 1612-16.) On this form, CNP Garfield marked the symptoms applicable to Mr. Sallee's diagnoses as: depressed mood; anxiety; suspiciousness; panic attacks that occur weekly or less often; near-continuous panic or depression affecting the ability to function independently, appropriately, and effectively; chronic sleep impairment; impairment of short and long term memory; flattened affect; circumstantial,

circumlocutory, or stereotyped speech; speech intermittently illogical, obscure, or irrelevant; difficulty in understanding complex commands; impaired judgment; impaired abstract thinking; gross impairment in thought processes or communication; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships; difficulty adapting to stressful circumstances, including work or a work like setting; inability to establish and maintain affective relationships; obsessional rituals which interfere with routine activities; impaired impulse control, such as unprovoked irritability with periods of violence; persistent delusions; grossly inappropriate behavior; and, persistent danger of hurting self or others.[10] (AR 1615.)

### B. ALJ's Treatment of CNP Garfield's Opinions

ALJ Fellabaum did not state the weight she afforded CNP Garfield's opinions. (AR 29.) However, she did indicate that these opinions included inconsistencies and other potentially discrediting matters. (AR 29.) For example, the ALJ stated that CNP Garfield "attributed [Mr. Sallee's] current mental symptoms largely to his chronic pain," but she never treated Mr. Sallee for his physical complaints and "other evidence does not support [Mr. Sallee's] allegations regarding the severity of chronic pain and physical limitations."[11] (AR 29.) Further, the ALJ stated that "treatment notes show some improvement with psychotropic medications," that CNP Garfield

---

[10] Notably, in her decision, the ALJ did not discuss the serious symptoms CNP Garfield marked on the VA questionnaire. (*See generally* AR 26, 29-30.)

[11] In fact, CNP Garfield wrote that Mr. Sallee's mental impairments resulted from his back injury rather than his pain. (*See* AR 1571 (stating that Mr. Sallee's psychological symptoms "are related to back injury, and mood disorder"); AR 1573 ("Limitations [and] no useful Ability [sic] to function [are] related to chronic back injury that occurred in 2011."); AR 1614 (stating that "Sentinel Event" relevant to Mr. Sallee's treatment was a "[b]ack injury in 2011"). Thus, the ALJ's description of CNP Garfield's attribution of Mr. Sallee's mental impairments to chronic pain appears to be inaccurate.

failed to address an inconsistency in Mr. Sallee's report to her about his prior alcohol use,[12] and that she failed to address Mr. Sallee's "ability to maintain a relationship with a girlfriend … which appears inconsistent with the opined social limitations."[13] (AR 29; *see* AR 1296, 1515, 1528, 1614.) Finally, the ALJ suggested that CNP Garfield's statement that Mr. Sallee depends on his mother to manage his medications and finances is inconsistent with his statement to consultative psychological examiner Brian Whitlock, Ph.D., and Psychological Technician Erin Montgomery, M.S., that he is able to look after his own personal hygiene, cook and clean to a very limited extent, and manage his finances.[14] (AR 29; *see* AR 1332.)

In the paragraph immediately following her discussion of CNP Garfield's opinions, ALJ Fellabaum evaluated Dr. Whitlock's opinion that Mr. Sallee would not have "difficulty with adapting to changes in the workplace, managing stress in the workplace, and getting along with customers/co-workers due to his mental issues." (AR 30; *see* AR 1333.) She gave Dr. Whitlock's opinion "little weight," partly because "his opinion of no significant work related mental limitations is not consistent . . . with the opinion of treating Nurse Practitioner Garfield." (AR 30.)

---

[12] However, the ALJ did not explain how or why CNP Garfield's opinions would or should have been different had she noted the inconsistency in his report about alcohol use. (AR 29.)

[13] The Court notes that, at most, the records to which the ALJ cited on this point document Mr. Sallee's ability to "maintain" a romantic relationship for a few months. (AR 29 (citing AR 1296, 1515).) Specifically, the first record, from April 2017, simply refers to a "girl friend in another town," and the second, from June 2019, refers to "his current relationship with a school teacher" as the reason why he stopped drinking three months earlier. (AR 1296, 1515.) The Court further notes that in discussing CNP Garfield's opinions, the ALJ did *not* address the fact that Mr. Sallee is divorced from the mother of his child, and that his child "mostly" does not live with him. (*See, e.g.,* AR 1331, 1522, 1614.)

[14] However, the ALJ later noted Mr. Sallee's testimony regarding the examination of Dr. Whitlock and Ms. Montgomery that "a girl from the local community college asked him questions, and that the psychologist just reviewed the answers." (AR 30.) Moreover, in her analysis of the severity of Mr. Sallee's mental impairments, the ALJ appears to have credited his testimony that his mother manages his finances. (AR 19.)

### C. Analysis of ALJ's Treatment of CNP Garfield's Opinions

Because CNP Garfield is a certified nurse practitioner, she is not an "acceptable medical source" under the applicable regulations. *See* 20 C.F.R. § 404.1502(a).[15] An ALJ must generally weigh opinion evidence from nonacceptable medical sources using the same factors for weighing opinions from acceptable medical sources listed in 20 C.F.R. § 404.1527(c), (f). Further, an ALJ

> generally should explain the weight given to opinions from [nonacceptable medical] sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ]'s reasoning, when such opinions may have an effect on the outcome of the case.

20 C.F.R. § 404.1527(f)(2).

An ALJ does not commit error when she fails to explicitly state the weight she gives to opinion evidence from a nonacceptable medical source so long as the weight she affords that opinion is evident from her discussion. For example, in *Keyes-Zachary*, 695 F.3d at 1156, the Tenth Circuit held that the ALJ did not err in failing to state the weight he gave to a nonacceptable medical source's assignment of a low score to a claimant's mental functioning because, "had [the ALJ] assigned great weight to the low … score, he would not have developed the [higher-functioning] mental RFC for [the claimant] that he did." *Id.* at 1163-64.

However, when an ALJ makes meaningfully inconsistent statements in her decision regarding the weight she affords an opinion, the ALJ commits error requiring remand. For

---

[15] The SSA has issued revised regulations regarding the evaluation of medical source opinions for claims filed on or after March 27, 2017. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). However, the parties agree that because Mr. Sallee filed his claims in 2012, (AR 109), the previous regulations still apply to this matter. (Docs. 26, 32); *see also* Social Security Administration Program Operations Manual System DI § 24503.050(D)(7) (for CDR determinations where initial claim was filed before March 27, 2017, and there has been no prior CDR, prior regulations apply).

example, in *Montoya v. Kijakazi*, 2021 WL 4168396, at *4 (D.N.M. Sept. 14, 2021), this Court reversed the ALJ's unfavorable decision, in part because the ALJ made contradictory statements relating to a physician's opinion of the claimant's limitations due to a brain injury. The ALJ in *Montoya* stated that he only gave the physician's opinion "some weight" because the physician formed her opinion without reviewing a neuropsychological evaluation finding that the claimant did not suffer long term effects from his brain injury. *Id.* at *3-*4. However, elsewhere in his decision, the ALJ referred to the brain injury as the origin of the claimant's limitations. *Id*. As the Court observed, "this plain inconsistency [made] it … impossible for the Court to determine whether [the neuropsychologist]'s contrary finding represented a valid reason for discounting portions of [the physician]'s opinion." *Id.*[16]

The Commissioner argues that, because ALJ Fellabaum discussed inconsistencies and other potentially discrediting matters in CNP Garfield's opinions, "the Court can follow the ALJ's reasoning consistent with Section 404.1527(f)(2) and determine that she discounted [CNP] Garfield's opinion on work-preclusive mental limitations and her vague conclusions in the VA form that [Mr. Sallee] had occupational and social limitations." (Doc. 32 at 19; *see* AR 29.) The Court might be inclined to agree with the Commissioner if this were the end of ALJ Fellabaum's discussion of CNP Garfield's opinions. However, it is not. Rather, the ALJ went on to give Dr. Whitlock's opinion of "no significant work related mental limitations" little weight partly because

---

[16] Unlike the present case, *Montoya* involved an opinion from an acceptable medical source. *See* 20 C.F.R. § 404.1502(a). Thus, the ALJ was required to state the weight afforded the physician's opinion rather than to merely make the weight evident from the discussion. *See Keyes-Zachary*, 695 F.3d at 1161. However, the reasoning in the *Montoya* decision remains applicable to the present case because, though the ALJ had latitude not to explicitly state the weight she afforded CNP Garfield's opinions, in the absence of an explicit statement, her contradictory statements regarding the opinions make it all the more difficult for a "subsequent reviewer to follow the [ALJ]'s reasoning." 20 C.F.R. § 404.1527(f)(2).

it "is not consistent ... with the opinion of treating Nurse Practitioner Garfield." (AR 30.) In other words, ALJ Fellabaum appears to have at least partially credited CNP Garfield's opinions by relying on them to discredit Dr. Whitlock's opinions. Nor did the ALJ explain the apparent discrepancy between her discussion discrediting CNP Garfield's opinions and her reliance on these opinions to discredit those of Dr. Whitlock.[17] (*See* AR 29-30.)

It is of course possible that ALJ Fellabaum intended to credit some of CNP Garfield's opinions and discredit others, and then rely on inconsistencies between the opinions she credited and Dr. Whitlock's opinions to reject the latter. But nowhere in her decision did she state or otherwise make this evident. And even if the Court were inclined to speculate on this point, it would not redeem the ALJ's error. Except for the "social limitations" to which CNP Garfield opined, the ALJ never identified or otherwise made discernible which, if any, of CNP Garfield's opinions she credited, and which she did not. (AR 29.) And indeed, even though the ALJ seems to have rejected CNP Garfield's opinions regarding Mr. Sallee's "social limitations" based on his purported ability to maintain a romantic relationship, she did not distinguish between CNP Garfield's various opinions falling into this category, (AR 29), even though one's ability to maintain a romantic relationship appears wholly irrelevant to some of the opinions, *e.g.*, the opinion regarding Mr. Sallee's limited ability to interact appropriately with the general public. (AR 1573-74.) Thus, the Court lacks an adequate basis from which to infer what weight the ALJ gave any of CNP Garfield's opinions.

---

[17] Notably, in his response to Mr. Sallee's motion, the Commissioner does not address the apparent discrepancy in the ALJ's treatment of CNP Garfield's opinions. (*See generally* Doc. 32.)

In sum, in evaluating a nonacceptable medical source opinion that "may have an effect on the outcome of the case,"[18] an ALJ must either state the weight she affords that opinion or articulate how she arrived at that weight such that a subsequent reviewer can "follow [her] reasoning." 20 C.F.R. § 404.1527(f)(2). And a court cannot follow an ALJ's reasoning when she appears to discredit an opinion in one instance and then credit it in another, without explaining the discrepancy. *Montoya*, 2021 WL 4168396, at *4. Here, ALJ Fellabaum failed to state the weight she gave CNP Garfield's opinions, made statements that appear to both credit and discredit the opinions, and offered no explanation for this apparently inconsistent treatment. Thus, contrary to the Commissioner's assertion, the Court cannot follow the ALJ's reasons for the weight she gave CNP Garfield's opinions, or even discern what that weight is. This failure to give a discernible indication of the weight afforded to CNP Garfield's opinions was reversible error. *Jensen*, 436 F.3d at 1165; 20 C.F.R. § 404.1527(f).

Accordingly, Mr. Sallee's Opposed Motion to Reverse or Remand (Doc. 26) is GRANTED. The decision of the Commissioner is reversed, and this matter is REMANDED to the Agency for further proceedings consistent with this Memorandum Opinion and Order.

IT IS SO ORDERED.

KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE

---

[18] The Commissioner has not argued harmless error regarding the ALJ Fellabaum's treatment of CNP Garfield's opinions. (*See generally* Doc. 32.) However, the Court notes that CNP Garfield opined to greater limitations than the ALJ's RFC appears to accommodate. (AR 21, 1573-74.) For example, CNP Garfield indicated that Mr. Sallee had "[n]o useful ability" to "[d]eal with normal work stress" or to "[p]erform at a consistent pace without an unreasonable number and length of rest periods." (AR 1573.) Had the ALJ properly weighed CNP Garfield's opinions regarding Mr. Sallee's impairments, she may have given them greater weight and thereby assigned Mr. Sallee a more restrictive RFC. Therefore, the Court cannot say that the ALJ's errors were harmless. *Cf. Mays v. Colvin*, 739 F.3d 569, 578-79 (10th Cir. 2014) (an ALJ's "failure to weigh a medical opinion involves harmless error if there is no inconsistency between the opinion and the ALJ's assessment of [RFC]").